Argued January 17; affirmed February 18, 1936

# WINTERS *v.* BISAILLON

(54 P. (2d) 1169)

*C. M. Hodges,* of Portland (Hodges & Gay, of Portland, on the brief), for appellant.

*William H. Morrison,* of Portland (Maguire, Shields & Morrison, of Portland, on the brief), for respondent.

BAILEY, J.  This is an action for damages for personal injuries sustained by plaintiff in a collision between motor vehicles in the city of Portland.  The accident occurred at the intersection of Southwest Sixteenth avenue and Southwest Salmon street on February 15, 1934.  At the time thereof plaintiff was driving his ambulance north on Southwest Sixteenth avenue and the defendant was driving his car, a Packard sedan, west on Southwest Salmon street.  Plaintiff's testimony tended to support his contention that the ambulance which he was driving entered the intersection first, while the defendant's testimony tended to prove that the defendant's car was first to enter the intersection.  The plaintiff by his own testimony admitted that he could not, because of an embankment, see cars approaching from the right, until his own motor vehicle had entered the intersection, or in his own words: ``As the nose of my car entered the intersection I looked to the right.  You can't see before that because there is a high bank there.''

The case was tried before the court and a jury and from a judgment entered on a verdict in favor of the defendant the plaintiff appeals.

In the affidavit of one of the attorneys for plaintiff, supporting his motion for a new trial, it is stated that the court gave the following instruction:

"The plaintiff does not claim the right of way because he was driving an ambulance, nor does he claim that he sounded the siren. He claims the right of way because he entered the intersection first, and the rule about sounding a horn applies to the defendant as it applies to the plaintiff, with regard to the sounding of the siren. Under the circumstances disclosed by the evidence, there was no occasion for the sounding of the horn."

It is further stated in the same affidavit that the affiant heard members of the jury talking among themselves in the corridor of the courthouse, to the effect that nine members of the jury had "decided that it was the duty of plaintiff to sound his siren when approaching, entering and traversing the intersection and that he was guilty of contributory negligence because he failed to do so".

■ Based upon this affidavit it is asserted by the plaintiff that the jury was guilty of misconduct in that it disregarded and refused to follow the above alleged instruction. However, no such instruction was given by the court; and even had such a charge been given, the verdict of the jury could not be impeached by an affidavit based on the statement of a juror as to what occurred in the jury room. Beginning with the case of *Cline v. Broy,* 1 Or. 89, and proceeding through an unbroken line of decisions to the same effect, this court has held that the affidavits of jurors as to what occurred during their deliberations may not be received to impeach their verdict: *State v. Smith,* 43 Or. 109 (71 P. 973); *Schmalz v. Arnwine,* 118 Or. 300 (246 P. 718); *Grammer v. Wiggins-Meyer Steamship Co.,* 126 Or. 694 (270 P. 759). Nor may the affidavit of a litigant or his

attorney be considered, as to what some juror said concerning misconduct of the jury: *Hinkle v. Oregon Chair Co.,* 80 Or. 404 (156 P. 438, 157 P. 789). It would naturally follow that if the affidavit of a juror is inadmissible to impeach a verdict, the affidavit of some other party based upon overheard conversation between jurors regarding the verdict would be equally inefficacious for that purpose.

■■ On the trial, the plaintiff requested the court to give the following instruction:

"The purpose of sounding a horn is to give warning of the approach of the automobile, when this is reasonably necessary to avoid danger or injury to others, by affording them an opportunity to take measures for their own protection. However, negligence can not be predicated upon a failure to sound the horn of the approach of an automobile when it was seen by the other party, as such warning would not communicate to him any knowledge he did not already have."

In this connection the court instructed the jury as follows:

"The only question here involved with regard to the giving of the signal, is whether or not, under the circumstances as disclosed by the evidence, a reasonably careful and prudent driver of an ambulance would have given the signal or sounded his siren. The same rule applies to that as would apply to the defendant with regard to sounding his horn. There is no occasion for the sounding of the horn, unless a reasonably careful and prudent person would have."

In support of the assignment of error based on this instruction the appellant argues that "negligence can not be predicated upon the failure to sound a horn or give other warning of the approach of an automobile when it was seen by the plaintiff or defendant, or both, because the giving of such warning would not communi-

cate any knowledge which they did not already have of the position of the other automobile".

The evidence is not certain as to when and at what distance from the intersection the defendant observed the plaintiff's ambulance. Since the plaintiff himself admitted that he could not see the approach of the car from the right until after he had entered the intersection, it is reasonable to assume that the defendant could not have seen the ambulance approaching before it reached the intersection. The requested instruction on the subject was faulty in that it assumed that the defendant did see the plaintiff's vehicle and that the sounding of the horn would not have made the defendant aware of any fact of which he was not already cognizant. The instruction which was given by the court was proper under the circumstances, and no error was committed in failing to give the above quoted instruction requested by the plaintiff. The accident occurred while § 35 of chapter 360, Oregon Laws 1931, giving the right of way to the driver of the vehicle first entering the intersection, was in effect.

Error was also predicated on the refusal of the court to give certain instructions requested by the plaintiff relating to the right of way at intersections and to the exercise of reasonable care and prudence in operating motor vehicles on the highway. Some of these instructions are argumentative, some of them have reference to the rule of the road in force prior to the amendment of such rules by the legislature in 1931, and some are not applicable to the facts in this case. Still others of the requested instructions were actually given verbatim. The court's charge to the jury fully covered the issues involved and no error was committed in failing to give the omitted parts of requested instructions.

■■ The two remaining assignments of error involve the question of whether the city ordinance limiting the speed of motor vehicles within the corporate limits of the city of Portland to 25 miles an hour is in conflict with the laws of this state regulating the speed of motor vehicles, and, if so, whether the state law or the city ordinance is controlling.

One of the acts of negligence with which the plaintiff charges the defendant is that the latter was driving at a greater rate of speed than 25 miles an hour. Ordinance No. 61219 of the city of Portland, passed August 12, 1931, provides that it shall be unlawful to operate a motor vehicle within the corporate limits of the city of Portland at a greater speed than 25 miles per hour. The circuit court refused to give certain instructions in this connection requested by the plaintiff, and ruled that the ordinance, in so far as it attempted to prescribe a maximum rate of speed, was contrary to the state law, hence, to that extent invalid.

Our first inquiry will therefore be directed to the question of whether the city ordinance is in conflict with the state law. For if it is not, then we need not consider which is applicable here, the statute or the provisions of the city ordinance.

Chapter 360, Oregon Laws 1931, is the only state law with which we are now concerned. Section 20, subdivision (a), of this act, is referred to as the basic rule and provides that "no person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent, having due regard to the traffic, surface and width of the highway and the hazards at intersections and any other conditions then existing". Subdivision (b) of the same section specifies the indicated speeds in passing schoolhouses, in approaching grade crossings of steam, electric or street railways, driving in business

districts, in residence districts, in public parks within city limits, and outside business and residence districts. It further provides a penalty upon conviction of violating the basic rule, and the penalty in case of violation of the basic rule coupled with infringement of the indicated speed limit is more severe than for violation of the basic rule only. No punishment is provided for exceeding the indicated speed limit unless some other provision of the act is also violated.

Sections 6 and 7, so far as the latter is applicable, of the act above referred to, are as follows:

"Section 6. The provisions of this act shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein and no local authority shall enact or enforce any rule or regulation in conflict with the provisions of this act unless expressly authorized herein.

"Section 7 (a). Local authorities, except as specifically authorized in this act, shall have no power or authority to alter any of the regulations declared in this act, or to enact or enforce any rule or regulation contrary to the provisions of this act, except that local authorities shall have power to provide by ordinance for the regulation of traffic by means of traffic officers or semaphores or other signal devices on any portion of the highway where traffic is heavy or continuous, and may prohibit other than one-way traffic upon certain highways, and may regulate the use of the highways by processions or assemblages; provided, however, that where one-way traffic is provided for, such authorities shall erect and maintain suitable signs at reasonable intervals upon said highway informing the public of such fact."

Section 21 of the act is as follows:

"Local authorities in their respective jurisdictions are hereby authorized in their discretion to indicate by ordinance higher speeds than those indicated in subdivision (b) of section 20 upon through highways or upon

highways or portions thereof where there are no intersections or between widely spaced intersections . . . giving notice of the indicated speed, but local authorities shall not have power to modify or alter the basic rule set forth in subdivision (a) of section 20, or in any event to indicate by ordinance a speed in excess of forty-five miles per hour.''

Chapter 360, supra, also confers upon cities power to enact ordinances relating to the regulation in certain respects of traffic within their corporate limits, by placing ''markers, buttons or signals within intersections'', or specifying that the course of vehicles turning left be other than that provided in the act: § 32 (d) ; or by placing appropriate signs, markings and traffic control signals: § 10, subdivision (a). But nowhere in the act are local authorities given any power to regulate the speed of automobiles otherwise than as hereinabove mentioned.

In the case of *Lidfors v. Pflaum,* 115 Or. 142, 157 (205 P. 277, 235 P. 1059), with reference to the regulation of automobile traffic this court observed:

''It would be a sad commentary on the wisdom of the electorate if we should hold that the movement of a citizen of the state or a traveler from abroad was subject to the whim of every municipality, great or small, between the Columbia river and the California line as to the rate of speed he should drive and the care he should exercise for the protection of others lawfully using the public highway. The state law is a criminal law whose every provision would be worthless but for the penalties prescribed for its violation.

''City ordinances may possibly be valid when not in conflict with the state. But when in conflict, they must yield to the right of the state to protect its citizens and the strangers within its gates everywhere.''

It was held in *Cummings v. Pitts,* 149 Or. 512 (41 P. (2d) 804), and *Dickson v. King,* 147 Or. 638 (34 P. (2d)

664), that the indicated speed specified in the 1931 act was not intended as either a maximum or a minimum limit, and that it depended upon whether the basic rule and other provisions of chapter 360 (§§ 26 to 49, inclusive) were being complied with or violated whether the speed at which the driver of a motor vehicle was traveling was lawful or unlawful. The fact that the law does provide (in § 23 of chapter 360, not applicable to the types of motor vehicles involved in this action) maximum speed limits for motor trucks, motor busses and motor vehicles equipped with solid or metal tires fortifies us in the interpretation which in those two precedents we placed upon the 1931 act, namely, that "indicated speed" was not intended by the legislature to signify either a maximum or a minimum rate. In *Cummings v. Pitts* we quoted with approval from *Kleinschmidt v. Scribner,* 54 Idaho, 185 (30 P. (2d) 362), as follows:

" 'Indicated speed' has an entirely different meaning from either 'lawful' or 'unlawful' speed, the indicated speed being neither lawful nor unlawful."

In *City of Baraboo v. Dwyer,* 166 Wis. 372 (165 N. W. 297), the court had under consideration the question of whether a city ordinance fixing a definite limit of speed at 10 miles an hour was in conflict with a Wisconsin statute providing that "no person shall operate or drive an automobile . . . recklessly or at a rate of speed greater than is reasonable and proper, having regard to the width, traffic and use of the highways and the general and usual rules of the road, or so as to endanger the property, life or limb of any person". In referring to these provisions of the statute, the court remarked:

"It is manifest from the foregoing that the legislature had in mind that in certain cases the speed limit

must depend upon the particular facts of the case, and that in such cases the speed limit should not be fixed by local authority, but be determined upon the facts of each case where the legislature made no specific limitation as to speed. The object of the legislature clearly was to establish a uniform regulation applicable to all localities, and thus avoid the confusion and uncertainty which would result to the traveling public by different speed limits in different localities."

The court then, after citing several authorities and quoting from others, continued as follows:

"It is obvious from the foregoing, as well as other provisions before referred to, that it was the intention of the legislature to exclude local legislation inconsistent with state legislation upon the subject. True, under the statute local authority shall not be prohibited from enacting ordinances in strict conformity with the state law, 'imposing the same penalty for violation of any of the provisions of said section', where the violation occurs within the jurisdiction of such local authority: Ogden v. Madison, 111 Wis. 413 (87 N. W. 568, 55 L. R. A. 506).

"The ordinance in question is not in conformity with our statute regulating speed of automobiles. It attempts to fix a limit of ten miles per hour over all bridges in the city of Baraboo, regardless of particular conditions. The ordinance provides a speed regulation fixing a speed different from the statute; hence it is in conflict therewith."

In *Schneiderman v. Sesanstein,* 121 Ohio St. 80 (167 N. E. 158, 64 A. L. R. 981), in discussing the question of whether a city ordinance providing a speed limit of 15 miles an hour was in conflict with the state law, the court said:

"When the law of the state provides that a rate of speed greater than the rate therein specified shall be unlawful, it is equivalent to stating that driving at a less rate of speed shall not be a violation of law; and therefore an ordinance of a municipality which attempts

to make unlawful a rate of speed which the state by general law has stamped as lawful would be in conflict therewith.

*      *      *      *      *

"The standard of conduct prescribed by statute is that the speed shall not be greater than reasonable and proper, considering the conditions and circumstances there enumerated, and that is the test that must be applied under the statute. The conditions of travel may be such as to require a much less speed than fifteen miles to meet the requirement that the speed shall not be greater than is reasonable and proper. On the other hand, a given speed may be well within the requirement of statute, though somewhat in excess of the rate arbitrarily fixed by ordinance."

See, also, in this connection: *Hoigard v. Yellow Cab Company,* 320 Ill. 317 (150 N. E. 911); *Mendel v. Dorman,* 202 Ky. 29 (258 S. W. 936); *Eshner v. Lakewood,* 121 Ohio St. 106 (166 N. E. 904); and *Ex parte Daniels,* 183 Cal. 636 (192 P. 442, 21 A. L. R. 1172, including annotation).

We conclude that the part of the city ordinance above referred to restricting speed of motor vehicles within the corporate limits of the city of Portland to 25 miles per hour does conflict with both the letter and the spirit of chapter 360, Oregon Laws 1931. An effort has been made throughout the country to enact, as far as possible, uniform laws relating to the use of highways by motor vehicles, in the various states of the Union. This purpose is emphasized by the wording of § 91 of the act, thus: "This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." Of even greater importance is the necessity, or at least the advisability, of having uniform laws regulating motor traffic within the borders of each state. Such

laws are desirable in view of the great percentage of the public that travels by motor vehicle. If it were possible to fix a maximum rate of speed of 25 miles per hour in the city of Portland, there would be nothing to prevent fixing a much less or greater rate of speed in any other municipality of the state; and such speed limit in that event might depend only upon the whim or caprice of the local authorities without regard to reasonableness. Were the rate of speed definitely fixed, it would tend to minimize the importance of the basic rule and might, as stated in *Schneiderman v. Sesanstein, supra*, be considered as the lawful rate of speed.

We shall now take up the question of whether, in the regulation of motor traffic within the limits of incorporated cities, state laws or city ordinances are controlling.

In *Kalich v. Knapp,* 73 Or. 558 (142 P. 594, 145 P. 22, Ann. Cas. 1916E, 1051), this court held that the motor vehicle law of 1911 was unconstitutional in so far as it attempted to regulate speed of automobiles in the city of Portland. The decision in that case was based on article XI, § 2, of the constitution, commonly referred to as the Home Rule amendment, prohibiting the legislative assembly from enacting, amending or repealing "any charter or act of incorporation for any municipality, city or town", which provision further specified that "the legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the state of Oregon". The opinion in that case was followed by the court in *Everart v. Fischer,* 75 Or. 316 (145 P. 33, 147 P. 189).

There was a departure from the decisions in the two foregoing cases, in *Rose v. Port of Portland,* 82 Or. 541 (162 P. 498), and *Lovejoy v. Portland,* 95 Or. 459 (188

P. 207), which cases, although not involving regulation of automobile speed, appear to have changed the law as enunciated in the preceding instances and to have upheld the power of the legislature to enact general laws affecting municipalities. In the very recent case of *Burton v. Gibbons,* 148 Or. 370 (36 P. (2d) 786), many authorities on the subject were cited and reviewed and it was held that a general law applicable throughout the state was paramount and controlling over all charters and ordinances in conflict with it. In the opinion therein the court quoted with approval from *Rose v. Port of Portland,* supra, as follows:

"The legislature has a right to pass a general law concerning municipalities, cities and towns; the right is contained in the constitution; and therefore when the legal voters of a city or town enact or amend a charter they do so subject to the right of the legislature to pass a general law because their right to enact or amend their charter must be exercised 'subject to the constitution'."

In *Burton v. Gibbons,* supra, this court continued:

"Since that decision, all later cases have approved that ruling and it is now settled that, within the limits prescribed by the other provisions of the state constitution and of the federal constitution, the power of the legislature to enact a general law applicable alike to all cities is paramount and supreme over any conflicting charter provision or ordinance of any municipality, city or town."

In *Ex parte Daniels,* supra, it is said:

"The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control [citing authorities]. The right of control over street traffic is an exercise of a part of the sovereign power of the state. Elliott on Roads and Streets, sections cited *supra.* While it is true that the regulation of traffic upon a public

street is of special interest to the people of a municipality, it does not follow that such regulation is a municipal affair, and if there is a doubt as to whether or not such regulation is a municipal affair, that doubt must be resolved in favor of the legislative authority of the state.''

The regulation of automobile traffic on the streets of the city of Portland, which are used by all the people of Oregon, is of as much general concern to the state at large as is the refunding of bonds of a municipality in this state, which was the question involved in *Burton v. Gibbons,* supra, wherein it was held that the general law of the state superseded any charter provision on the same subject.

■ We conclude that *Kalich v. Knapp,* supra, *Everart v. Fischer,* supra, and any other pronouncement of this court to like effect, in so far as they hold that by the constitution cities are granted exclusive or paramount authority to regulate motor vehicle traffic within their corporate limits, have been overruled by subsequent decisions of this court and in the future should not be considered as the law of this state. We further hold that the state has and retains, either by act of the legislature or by vote of the electorate, the right to enact general laws prescribing the speed of motor vehicles and general rules regulating traffic on the highways of the state, which right when exercised can not be curtailed, infringed upon or annulled by local authorities.

We concur in the view of the circuit court that the ordinance here involved, in so far as it attempts to prescribe a speed limit for motor vehicles in the city of Portland, is invalid. The judgment is affirmed.

CAMPBELL, C. J., and BEAN and RAND, JJ., concur.